## HUNT v. THE TRAWLER BRIGHTON, Inc.
### No. 51–31.

United States District Court
D. Massachusetts.
Jan. 24, 1952.

Morris D. Katz, Boston, Mass., for plaintiff.

Thomas H. Walsh, Boston, Mass., for defendant.

FORD, District Judge.

Libelant in this suit seeks to recover maintenance and cure for the period during which he was disabled following an injury received on February 6, 1951. The important question is whether, at the time of his accident, libelant was in the service of the respondent's ship.

Sometime in December, 1950, libelant, who has been for several years a fisherman on vessels sailing from Boston, was asked by the mate and later by the captain of the trawler Brighton, owned by the respondent, if he wished to make a trip with them. As a result, he went on that trip and also for two or three more consecutive trips with the same trawler, working as a deck hand and fisherman.

The last of these trips ended on the morning of February 5, 1951. After finishing his work at the vessel, libelant spent the remainder of the day visiting with his aunt, and in the late afternoon returned to his room in a lodging house in Dorchester. He went to bed about 7 p. m., and slept until about 2 a. m., on February 6. He then got up and left the house, intending to go to a restaurant for a meal. Shortly after reaching the sidewalk he fell and injured his leg.

He was able to hobble back to the house and in the morning was treated by a doctor. He asked another roomer in the house, also a fisherman, to notify the captain of the vessel he would be unable to report for the next trip. On February 7, he went to the Marine Hospital in Brighton and was admitted as a patient. It was discovered that a bone of the leg had been broken. He remained at the hospital until February 19, and thereafter returned six times for out-patient treatment. Libelant traveled to and from the hospital by taxicab, at a cost of two dollars per trip each way. The last of these visits was on May 14, 1951, when he was discharged fit for duty. On or about June 1, 1951, he went to work on another vessel as a fisherman.

From the evidence, it appears that it is the practice among the fishing vessels working out of Boston for the vessel to remain tied up at the dock for forty-eight hours after each trip before starting on the next trip. Members of the crew are ordinarily free to take this period as shore leave, leaving the vessel and going about their own affairs. Captain Magnuson of the Brighton testified that they could be called upon to perform such work as mending nets during this period, although he did not in fact call upon members of his crew to do this except at the time of the annual overhauling of the vessel. A crew member could terminate his employment with the vessel by notifying the captain he did not intend to go on the next trip, or simply by failing to report in time to make the trip, and he could be discharged by the captain before the start of each new trip. A crew member who had a "steady site" continued to make each trip with the vessel until he quit or was discharged. No one, not even the captain, appears to have any written contract of employment for any definite term.

There is no doubt that libelant was, at the time of his injury, a seaman and a member of the crew of the trawler Brighton. After his original conversation with the mate and the captain he had made at least three successive trips, working as a deck hand and fisherman, and receiving the share of the proceeds of each trip due to a member of the crew. There had been no further discussion of his employment. He had reported for each succeeding voyage. Up to the time of his accident he had not been discharged and had done nothing to terminate his employment. Respondent in its answer to libelant's interrogatory No. 7 says it does not claim there was a separate contract of employment for each trip. He must be considered as having been employed on a "steady site" and to have continued as a member of the crew up to the time of his injury. If his injury occurred while he was in the service of the vessel, he is entitled to maintenance and cure.

Respondent argues that libelant, while he was on shore leave in his home port, going about his own affairs and not actively engaged in any activity connected with his ship, cannot be considered as having been in the service of the ship. This contention must be rejected. The right to maintenance and cure is not determined by what the seaman is doing when he receives his injury. It is only required that he be in the service of the ship in the sense of being generally answerable to the call of duty. "For any purpose to introduce a graduation of rights and duties based on some relative proximity of the activity at time of injury to the 'employment' or the 'service of the ship,' would alter the basis and be out of harmony with the spirit and function of the doctrine * * *." Farrell v. United States, 336 U.S. 511, 516, 69 S.Ct. 707, 710, 93 L.Ed. 850. A seaman on shore leave is still in the service of his ship. Aguilar v. Standard Oil Co., 318 U.S. 724, 733, 63 S.Ct. 930, 87 L.Ed. 1107. It is true that the Aguilar case was confined to its own facts and left open the question of whether all activities on shore leave were included, but this question appears to have been settled in Warren v. United States, 340 U.S. 523, 71 S.Ct. 432, 95 L.Ed. 503 where maintenance was allowed to a seaman injured at a dance hall where he had gone purely for his personal diversion. This right of the seaman is not limited, as respondent argues, to the case of injuries which occur while on shore leave in foreign ports, but extends also to the case where the injury is received in the seaman's home

302

port. Smith v. United States, 4 Cir., 167 F.2d 550; Reed v. Canfield, 20 Fed.Cas. p. 426, No. 11,641.

 There remains the contention that libelant cannot recover here since he had not signed articles. It is true that in the cases cited above the seaman had signed articles, or at least it does not appear that he had not signed articles. But in none of them is it stated that the signing of articles by a seaman is a prerequisite to his right to maintenance and cure. No case has been found which makes that requirement. Respondent's argument seems to be that even though there may be no such general requirement, only an articled seaman should be entitled to maintenance and cure when he is injured while on shore leave in his home port. The argument is apparently based on the ground that in such a situation the seaman who has not signed articles is in some way less subject to the discipline and control of the master of the vessel. There is no valid justification for such a distinction. Neither does there seem to be any reason for making the extent of libelant's rights as a seaman depend on the fact that his contract calls for the payment of his wages in the form of a share in the proceeds of each trip, paid at the end of the trip, rather than at a fixed monthly rate. "It has been the merit of the seaman's right to maintenance and cure that it is so inclusive as to be relatively simple, and can be understood and administered without technical considerations." Farrell v. United States, supra, 336 U.S. at page 516, 69 S. Ct. at page 709.

 Libelant was fully cured, so far as medical treatment could aid him, on May 14, 1951. He is entitled to recover maintenance for the period of eighty-five (85) days from February 6, 1951 to May 14, 1951, excluding, however, the period from February 7 to February 19, when he was an in-patient at the Marine Hospital. A fair and reasonable allowance for maintenance is $35 per week. Libelant is also entitled to recover $24, the cost of transportation to and from the hospital for out-patient treatment.

There will be a decree for libelant in the amount of $449, with costs.